FILED

2014 Dec-23  AM 08:16
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| MILTON WATKINS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case Number: 5:12-cv-02747-JHE |
| | ) | |
| EFP, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION[1]

Plaintiff Milton Watkins ("Watkins") initiated this action against his former employer, Defendant EFP, LLC ("EFP"), for alleged race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") and Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("§1981").   (Doc. 1).   EFP seeks summary judgment on Watkins' claims.   (Doc. 14).   The motion is fully briefed and ripe for review. (Docs. 15, 22, & 26).   For the reasons stated below, EFP's motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**.

### I. Standard of Review

Under Rule 56(c)(2) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, the discovery, and disclosure materials on file, and any affidavits shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  "Rule 56(c) mandates the entry of summary judgment, after adequate time

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including trial and the entry of final judgment.  (Doc. 28).

for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 447 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id.* at 323, 106 S. Ct. at 2553. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish there is a "genuine issue for trial." *Id.* at 324, 106 S. Ct. at 2553. (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986).

The Court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608 (1970); *see also Anderson*, 477 U.S. at 255, 106 S. Ct. at 2514 (all justifiable inferences must be drawn in the non-moving party's favor). Any factual disputes will be resolved in Plaintiff's favor when sufficient competent evidence supports Plaintiff's version of the disputed facts. *See Pace v. Capobianco*, 283 F.3d 1275, 1276-78 (11th Cir. 2002) (a Court is not required to resolve disputes in the non-moving party's favor when that party's version of the events is supported by insufficient evidence). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mtn. Park, Ltd. V. Oliver*, 836 F.2d 1560, 1563 (11th Cir. 1989)). Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that

the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252, 106, S. Ct. 2512).

## II. Factual Background

EFP operates a foam manufacturing plant in Decatur, Alabama.  (Docs. 16-6 at ¶4).[2] EFP's parent corporation is the John B. Poindexter Company ("JBPCO").  (Doc. 16-7 at 3-4 (8:16-9:5)).  Watkins, a black male, worked at the Decatur plant as a "Warehouse B" employee form October 19, 2010, until his termination on June 22, 2011.  (Docs. 16-4 at 102, 16-5 at 38-38).  EFP employees are also referred to as "Team Members."  (Docs. 16-4 at 23).  EFP assigned Watkins to work second shift during his employment. (Doc. 16-1 at 10 (30:4-7)).  At all times relevant to this action, John Dunn ("Dunn"), a white male, was the second shift supervisor. (Doc. 16-1 at 19-20 (69:17-70:4)).  Dunn voluntarily resigned on July 21, 2011.  (Doc. 71-1 at 9 (28:12-20)).  When Dunn was absent, David Harvel, a white male, would sometimes fill in for him.  (Doc. 16-1 at 19-20 (69:22-70:4)).

Ronnie Cottles ("Cottles"), a white male, was EFP's Production Manager from approximately January 2011 through the end of Watkins' employment.  (Doc. 18-3 at ¶1).  As Production Manager, Cottles was responsible for production on all shifts, and the shift supervisors reported to him.  (*Id.* at ¶2).  Cottles' typical work day was from 5:00 a.m. until 4:00 p.m.  (*Id.*).  Although Cottles hours primarily covered first shift, he sometimes stayed on after the start of second shift (starting at 4:00 p.m.) to communicate with second shift team members what he needed done if necessary.  (Doc. 17-1 at 38 (143:8-15)).

Beverly Thompson ("Thompson"), a white female, was EFP's Human Resources

---

[2] All citations to the record refer to document and page numbers as assigned by the Court's electronic filing system, except for citations to depositions, which also include a parenthetical with the deposition page number(s) and line number(s).

Manager from May 2007 through April 2012.  (17-4 at 3-4 (8:3-9:7)).  Her regular hours were from 8:00 a.m. to 5:00 p.m. (*Id.*).   In April 2012, Thompson left for another position and Melonee Wilkerson, a white female, replaced Thompson as HR Manager while maintaining the duties of her previous position, Quality, Health, and Safety Manager ("QHSM").  (Doc. 17-6 at 3 (6:22-8:10)).  From October 2011 through April 2012, Wilkerson served as EFP's QHSM.  (*Id.* (7:15-9:12)).  From May 2011 through October 2011, Wilkerson was EFP's Quality, Health, and Safety Coordinator ("QHSC"), an interim training position created for the purpose of training Wilkerson to replace the retiring QHSM.  (*Id.* at 3-4 (8:6-9:12)).  Wilkerson's position prior to May 2011, and at all time during Watkins' employment (except for June 2011), was as Quality Inspector, a bargaining unit position.  (*Id.* at 4 (9:16-12:10)).  All members of the bargaining unit,[3] whether an actual member of the Union or not, are subject to the Collective Bargaining Agreement ("CBA"), including being represented by the Union during grievances as well as receiving a seniority date.  (Doc. 16-6 at  at ¶3).   While in the Quality Inspector position, Wilkerson served as the Union recording secretary and shop steward.  (*Id.*).

Jim Watts ("Watts") was EFP's Decatur plant manager from August 20, 2007 through November 7, 2011.  (Doc. 18-1 at 4-5 (11:14-17, 13:21-14:4)).

Around March 2011, Eric Yeager ("Yeager"), formerly the Vice President of Continuous Improvement for JBPCO, became acting President of EFP Decatur and was physically present, albeit periodically, at the Decatur plant beginning June 1, 2011.  (Doc. 16-7 at 4-5 (9:3-7, 12:18-14:16)).  Yeager brought Buck Scalzo ("Scalzo"), a white male JBPCO employee, with him to the Decatur plant during this timeframe to assist with soliciting employee engagement to understand employee "problems and challenges."  (*Id.* at 10 (33:13-34:6)).

---

[3] The Decatur plant's bargaining unit is the United Steel Workers, Local 207A (the "Union").  (Doc. 16-6 at ¶1).

**Decatur Facility and Manufacturing Process**

EFP Decatur makes foam packaging products for its customers. (Doc. 16-6 at ¶4). The Decatur facility has one primary area and one secondary area where its products are formed by industrial machines. (*Id.*). The primary area contains twelve industrial foam production machines. (*Id.*). The secondary area contains five smaller machines, known collectively as "thinwall," which produces only foam cups. (*Id.*).

The Decatur plant is a large industrial building with extensive storage areas ("warehouse" areas) where bundles are stacked and temporarily stored until shipped to customers. (*Id.* at ¶5, 8 (map of Decatur facility)). The area marked "Mezzanine" on the Decatur facility map is the primary area where the twelve machines are located. (*Id.*). The area marked "thinwall cup area" in the diagram is the secondary area where the thinwall machine is located. (*Id.*). The primary warehouse storage area for bundles is approximately the size of a football field. (*Id.*).

The machines, or "presses," produce different size and shapes of foam products depending on a given order, (Docs. 16-1 at 19 (68:19-69:8) & 16-7 at 8 (25:1-7)), and the size and shape of the product is affected by periodic, and sometimes daily, "mold" changes. (Doc. 18-3 at ¶4). The molds are changed out by EFP's "Mold Maintenance" and/or "Set-Up" Positions to meet customer orders. (Doc. 16-6 at ¶ 7). Machines are periodically shut-down for various reasons including mold changes, which results in machine downtime and reduces the workload during periods of non-operation. (Docs. 18-3 at ¶4 & 16-1 at 48 (184:3-185:12)). The size and shape of the products coming off a machine and the machine's associated cycle times affect a Warehouse B employee's daily workload. (Doc. 16-1 at 19 (69:6-12)).

When the product leaves the individual machines, one of EFP's "Packers" removes finished parts from the machines, accounts for them, and then places them in a designated area, a

"staging area," of Warehouse B employees.  (Doc. 18-7 at 74).  The size and shape of the product affect the heaviness and rate of production of each product.  (Doc. 16-1 at 19 (69:6-12)).

During Watkins' employment Decatur employees generally worked two shifts and would only periodically operate a third shift.  (Doc. 16-6 at ¶2).  The first shift started at 8:00 a.m. and ended at 4:30 p.m., and the second shift started at 4:00 p.m. and ended at 12:30 a.m.  (Doc. 18-3 at ¶2).

### Work Assignments and Job Duties

Cottles deferred to his shift supervisors, including Dunn, regarding work assignments, including whether to assign machines to each Warehouse B employee and which machines to assign.  (Doc. 17-1 at 21-11 (77:18-81:19), 39 (146:15-147:23)).  Cottles entrusts his supervisors to enforce (and their subordinates to follow) the rules, including the April 2011 bundle-stacking rule, to be discussed *infra*.  (*See* doc. 17-1 at 48 (184:12-21)).  Dunn was responsible for structuring work assignments for Warehouse B employees on second shift.  (Docs. 17-1 at 18 (63:23-64:21), 16-1 at 19 (69:13-19)).

Watkins, along with two other employees, was assigned to second shift Warehouse B.  (Doc. 16-1 at 19 (67:1-18), 48 (183:12-13)).   Jason Mullins ("Mullins"), a black male, and David Russell ("Russell"), a white male, filled these positions from April 8, 2011 until Watkins' termination.  (Doc. 16-1 at 19 (67-1-18)).  Other warehouse employees subject to the bundle-stacking policy included Patrick Malone, DeShaun Smith, Zachary Pirtle, Antonio Lee, Terrence Jones, Jimmy Reid, Milton Malone, and Jonathan Ray.  (Doc. 20-25 at 2).

After the products are placed in staging areas by each machine, Warehouse B employees must "strap and wrap" the product into bundles, which are then stacked on wheeled "buggies" and transported by hand to the warehouse, where the bundles, still stacked, are slid off the buggy

into the location where they will be stored in the warehouse.  (Docs. 16-6 at ¶8, doc. 16-1 at 18 (64:1-19), & 17-1 at 45 (172:2-6), 46 (174:14-19)).  All second shift Warehouse B employees were responsible for ensuring the product was strapped, wrapped, and moved during their shift.  (Docs. 16-1 at 18 (64:13-22) & 17-1 at 39 (146:3-20)).  Following a reduction in Warehouse B staffing on second shift, (doc. 16-1 at 48 (183:10-184:2)), Dunn generally assigned Watkins and Mullins five machines each.  (*Id.* at 19 (67:13-68:11), 24 (86:8-10)).  Russell was typically assigned two particular machines that allegedly "ran way slower" than Watkins' five machines, resulting in an easier workload for Russell according to Watkins.  (*Id.*).  The three of them rotated on thinwall.  (*Id.* at 24 (88:7-17)).

### EFP Decatur Promotion and Testing Program

The CBA in effect during Watkins' employment, completed and signed in August 2009, includes information concerning promotions as well as a non-discrimination clause.  (Doc. 17-5 at 24, 29).  Past practices between the Union and EFP, including job requirements, were not necessarily memorialized in the CBA.  (Doc. 17-4 at 6-7 (20:15-21:20)).

Generally, notices of job openings at EFP are posted on a bulletin board at the Decatur facility, and EFP employees are allowed to "bid" on the job internally.  (Doc. 16-6 at ¶9).  To bid, an employee need only to sign the posting. (Doc. 16-6 at ¶9).  Openings are filled based on an employee's qualifications for the position and his or her seniority, irrespective of whether the employee is a member of the Union.  (*Id.*).

To be eligible for certain advanced positions at the Decatur facility, generally Mold Maintenance and Set-Up positions, employees must take and pass a Mechanical Comprehension Test ("MCT").  (Doc. 17-4 at 5 (13:4-19)).  At all times during Watkins' employment, Thompson was responsible for administering and grading the MCT. (Docs. 17-5 at 2-21 & 18-1

at 33 (126:19-127:2)).  The MCT was administered in connection with job openings, as needed, for open positions, or upon the employee's request, subject to a potential objection by the Union. (Doc. 17-4 at 5 (13:20-14:19), 8 (26:19-28:6)).

Based on past practice with the Union, EFP contends it was standard practice to require an employee to wait six months between failing the MCT and retaking it.  (Doc. 17-4 at 6 (18:22-19:2)).  While the CBA contemplates the MCT, this practice was not reduced to writing in the 2009 CBA.  (*Id.* at 7 (22:13-23:7)).  An employee promoted into a position requiring the MCT, including Set-Up, was then eligible to advance *further within the position* depending on their score on a Level Test related to the position.  (Doc. 17-4 at 7 (23:14-19)).  Under the CBA, an employee who failed the Level Test had to wait four months before being eligible to retake it. (Doc. 17-4 at 7 (23:14-19)).

Watkins does not understand how the Level Tests are administered or the associated timeframe between failing a Level Test and being eligible to retake it.  (Doc. 16-1 at 58 (222:22-223:5) & 59 (227:18-23)).  Watkins testified another employee was able to retake the MCT four months after failing it.  (Doc. 16-1 at 60 (230:6-17)).  Watkins contends another employee, Josh Proctor ("Proctor"), a white male, was permitted to take the MCT in October 2010 and again in February 2011.  (Doc. 16-1 at 60 (230:6-17)).  There is no evidence other than Watkins' testimony regarding what Proctor told him, inadmissible hearsay,[4] that Proctor took the MCT in

---

[4] Hearsay evidence may be considered on a motion for summary judgment if the statement could be reduced to an admissible form at trial and the statement would be admissible at trial for some purpose.  *Macuba v. Deboer*, 193 F.3d 1316, 1323 (11th Cir. 1999).   "For example, the statement might be admissible because it falls within an exception to the hearsay rule, or does not constitute hearsay at all (because it is not offered to prove the truth of the matter asserted), or is used solely for impeachment purposes (and not as substantive evidence).  *Id.* at 1323-24.  Watkins' testimony regarding what Proctor told him about the test in October 2010 is offered to prove the truth of the matter asserted and is thus inadmissible and will not be considered in ruling on EFP's motion for summary judgment.  *See e.g., Jernigan v. Dollar*

October 2010.  The cover sheets from Proctor's August 2010 and February 2011 MCTs are in the record.  (Doc. 17-5 at 5-6).  No cover sheet for any October 2010 MCT was provided. Watkins' testimony that, at one point, Thompson told him he could retake the test four months after he failed it, not six, is also inadmissible hearsay.  (Doc. 16-1 at 59 (226:21-227:17)). Because EFP required Watkins to wait at least six months to retake the MCT, Watkins was not permitted to retake the test prior to Anthony Parker ("Parker"), a white male with less seniority, being awarded the Set-Up position.  (Docs. 25-15 at 15 & 16-5 at 43).

**EFP's Policies and Discipline Process**

The CBA, along with the Employee Handbook, govern employee discipline at EFP. (Docs. 16-1 at 51 (195:13-22) & 16-4 at 23-65, 66-85).  The Employee Handbook does not replace or override the CBA, but rather complements it.  (*See e.g.*,, doc. 16-4 at 25).

The CBA contains EFP's attendance policy and contains progressive discipline for employee "occurrences" or points under the system.  (Doc. 16-4 at 84-85).  Subject to past practice discussed *infra*, the CBA prescribes attendance discipline for occurrences within a twelve month period as follows: Two points, oral or "verbal" warning; four points, written warning; six points, three day suspension; eight points, "automatic discharge."  (Doc. 17-5 at 41).  Points will be removed from the employee's record after one year.  (*Id.*).  Employees can also earn back half a point for every thirty calendar days of perfect attendance.  (*Id.*).

The Employee Handbook policies prohibit discrimination, harassment, and retaliation.[5]

---

*General Corp.*, No. 2:11-cv-01448-WMA, 2013 WL 452820, *8 (N.D. Ala. Jan. 31, 2013); *Bridges v. City of Americus*, No. 1:09-cv-56, 2014 WL 1315339, *3 n.1 (M.D. Ga. March 31, 2014).  Watkins has offered no argument to the contrary.

[5] Watkins contends the handbook contains no procedure for reporting "discrimination" as opposed to "harassment."  (Doc. 22 at 6).  While it is true EFP's Policy and Prohibition Against Harassment outlines specific procedures for reporting harassment, (doc. 16-4 at 30-31), EFP's general "Open Door Policy," is not limited to harassment, (*id.* at 28).

(Doc. 16-4 at 29-31).   The Employee Handbook also contains an "Open Door Policy" prescribing a procedure for employee complaints as well as a non-retaliation policy, which includes EFP's policy that, in response to an employee complaint of discrimination, EFP will investigate the relevant facts and take prompt and preventative action where necessary.   (*Id.*). The policy also notifies employees that false allegations of harassment will be dealt with in similar disciplinary actions as  engaging in objectionable conduct.   (*Id.*at 31).   The Employee Handbook also proscribes violations of safety rules ("Rule 10") and provides "[t]he severity of the [safety] violation determines the level of disciplinary action" up to and including termination. (Doc. 16-4 at 58).

Employees must be present at work to receive discipline.  (Doc. 16-6 at ¶10).  Under the CBA, EFP's past practice dictated that employees must receive the next step of attendance discipline upon returning to work, even if having accrued sufficient points to receive a higher level of discipline. (Doc. 17-4 at 30 (115:23-117:20)).  For example, if an employee previously received a verbal warning, had accrued three points, then was absent for three days, but called in every day while absent prior to the start of his shift, upon his return he would have six points; however, he would only receive a written warning, the next level of discipline, and not a suspension.  (*Id.*; *see* doc. 16-6 at ¶12).

EFP contends when Cottles or shift supervisors observe an employee violating a work rule, they write down notes on what they observe and pass it on to HR, usually by dropping it in a little back box.  (Doc. 17-1 at 32-33 (120:23-122:11), 47(179:10-23, 181:13-17), 50 (193:23-194:8)).  EFP further contends Cottles and shift supervisors have no involvement in what level of discipline, if any, HR and/or the Plant Manger imposes after the written notes are turned in,  (*id.* at 47 (181:13-17)), and that this procedure was followed in the events leading to Watkins'

termination, (*id.* at 50 (193:23-194:8)).  Watkins disputes this procedure was followed during the events leading up to his termination, contending Watts (plant manager) testified that he conferred with Cottles (production manager), Dunn (supervisor), and Thompson (HR) prior to deciding what level of discipline to impose.   (Doc. 22 at 6 (citing doc. 18-1 at 23 (86:3-88:13))). According to Watts' testimony, he had separate conversations with Cottles, Dunn, Thompson, and Yeager.  (Doc. 18-1 at 23 (86:3-14)).  Watts testified he asked Dunn about the details of the incident, and Dunn verbally told him what he had written.   (*Id.* (86:15-19)).   Watts further testified Cottles, who had actually witnessed the incident, told him such, but did not tell him anything other than what he had written down.  (*Id.* (86:22-87:15)).  These facts indicate Watts conferred with Cottles and Dunn about the incident prior to Watkins' receiving any discipline. Watkins also contends Cottles testified supervisors always have the option of not writing an individual up for a safety violation, (doc. 22 at 6 (citing doc. 17-1 at 7-9 (20:6-29:8)), but the testimony he cites to support this assertion does not support it.  (Doc. 17-1 at 7-9 (20:6-29:8)) (Cottles testimony discussing management and supervisors generally).

Shift supervisors are tasked with delivering the written discipline to employees on their shifts in the presence of a Union shop steward.  (Doc. 18-3 at ¶7).

For willful or "gross" safety violations, those safety violations that are a conscious decision to do something that an employee has been trained not to do (as opposed to an unconscious violation) that could result in bodily harm, employees are subject to automatic discharge.[6]   (Docs. 17-4 at 16 (57:23-59:20) & 18-1 at 12 (42:20-22), 22 (81:4-5)).   This

---

[6] Although Watkins contends this is not EFP's policy, (doc. 22 at 6), the evidence he cites in support does not support his contention.  (*See* doc. 18-1 at 13 (45:15-46:16)).  Watkins' cites Watts' testimony explaining there is no blanket rule requiring the termination of an employee who commits a safety violation that could lead to injury.  (*Id.*).  Nowhere in the cited testimony

included violations of the "April bundle-stacking rule" at the center of this action.[7]  (Docs. 18-1 at 22 (83:3-11) & 18-2 at 19).  Cottles testified he told Warehouse B employees anyone who violated the April bundle-stacking rule would be doing so at his own risk because if he got caught, he'd be disciplined.  (Doc. 71-1 at 47 (180:3-21)).  Watkins contends Cottles instructed the warehouse employees to "do what we've got to do" to keep up with production goals after the new policy was in place, contending this instruction suggested they to break the rule if they needed to.  (Doc. 22 at 6 ¶33 (citing doc. 17-1 at 38 (141:22-147:2))),  However, Cottles testimony illustrates he instructed the warehouse employees to stack bundles two high (according to the rule), which may mean more trips and he explained that his instruction "to do what we've got to do" meant "you have to put them two on a buggy and take them back, and if takes more is what you have to do."  (Doc. 17-1 at 37-38 (141:6-142:6)).

**Watkins' Work History From October 19, 2010 through April 29, 2011**

EFP hired Watkins on or about October 19, 2010, as a Warehouse B employee.  (Doc. 16-4 at 102-03).  This is Watkins' seniority date for Union bidding purposes.  (Doc. 16-6 at ¶3).  On December 15, 2010, Watkins took EFP's Mechanical Comprehension Test ("MCT") in connection with bidding on a higher-paying, albeit temporary position.  (Docs. 16-1 at 67 (220:9-14, 16-5 at 2).  Watkins scored 44%.  (Doc. 17-5 at 4).  At the time, a score of 50% was required to pass.   (Doc. 17-4 at 5 (16:2-9)).  On or about December 19, 2010, Watkins received a raise.  (Doc. 16-4 at 104).

On January 28, 2011, Watkins incurred 2.5 points under EFP's attendance policy for absenteeism and received a verbal warning.  (Doc. 16-5 at 7).  On March 4, 2011, Watkins

---

does Watts mention a policy regarding violations involving a conscious decision to do something that an employee had been trained not to do, as opposed to an unconscious violation.  (*See id.*).

[7] This rule, explained more fully below, prohibiting employees from stacking bundles more than two high by hand for safety reasons.   (Docs. 18-1 at 21 (79:9-80:10) & 18-2 at 19).

incurred 5.5 points under the policy for absenteeism and received a written warning.  (*Id.* at 8).

On March 22, 2011, Watkins incurred 6.0 points under the policy for absenteeism and was

suspended.  (*Id.*).  Watkins was present at work each time he was disciplined.  (Doc. 16-1 at 54

(208:2-11), 55 (212:4-7)).

On April 15, 2011, Watkins injured his back attempting to lift a bundle and stack it three

high.  (Docs. 16-1 at 20-22 (70:5-80:3) & 16-4 at 11-16).  Watkins violated no rule or policy

when he injured his back, but was performing his job as he had been trained.  (Doc. 18-1 at 32

(121:21-122:8).  Watkins received medical treatment for his back strain, including a trip to the

emergency room the night of the injury, (doc. 17-4 at 10-11 (36:13-40:18)), and wore a back

brace while at work for some time after the injury, (doc. 16-1 at 22 (80:1-3)).

Following Watkins' injury, Watts and members of the safety committee, including Union

members, decided to implement a new rule prohibiting employees from stacking bundles more

than two high by hand, referred to as the "April bundle-stacking rule."  (Docs. 18-1 at 21 (79:9-

80:10) & 18-2 at 19).  The rule became effective April 18, 2011, (doc. 18-2 at 19), and required

employees to take three trips to the warehouse to transport the same number of bundles they used

to be able to transport in two trips, (doc. 17-1 at 37 (139:20-140:10).  No new Warehouse B

employees were added after the rule change, and the Warehouse B employees were expected to

keep up with production and not let the machines get shut down because bundles were backing

up.  (*Id.* at 37-38 (139:20-142:21).  Watkins, along with all Warehouse B employees on both

shifts, signed a written acknowledgment of this rule.  (*See id.*).  Watkins understood the new rule

related to his recent back injury stacking bundles and felt EFP took his back injury seriously.

(Docs. 16-1 at 13-14 (44:1-46:8) & 16-2 at 13 (284:22-285:2)).  Other Warehouse B employees

know the Rule was put into place because of Watkins' injury and were annoyed by it because it

would take longer for them to perform their job duties.  (Doc. 18-4 at 24 (89:3-20)).

Around the time the rule was implemented, Dunn allegedly told Watkins he was to "keep doing the job the way you've been doing the job" and "we're just signing the paper to satisfy the higher-ups so they can have something in writing."  (Doc. 16-1 at 13 (43:5-44:19), 14 (47:7-14)).  On at least one other occasion, Dunn told Watkins to "keep on doing the job the way you've been doing the job," and "something to the point, we ain't F-ing going to be here all night every night."  (*Id.* at 14 (47:15-22), 17 (60:3-5)).   Watkins recalls no witnesses to these alleged conversations.  (*Id.* at 14 (47:15-22), 17 (60:3-5)).   No other person at EFP told Watkins to ignore the April bundle-stacking rule, including Cottles.  (Docs. 16-1 at 15 (53:5-12), 18 (62:19-63:4) & 16-2 at 17 (298:1-18)).  Cottles, Thompson, and Watts had no knowledge of Dunn's alleged comments about ignoring the rule.  (Docs. 17-1 at 49 (186:20-187:1); 17-4 at 18 (67:1-68:4); & 18-1 at 23 (88:2-9)).     However, Watkins contends Cottles was present in the warehouse on a nearly daily basis, and white warehouse B employees continued to stack bundles three high after the rule was implemented.  (Doc. 16-2 at 18 (303:18-304:4), 43 (401:4-402:20)).  Even though Watkins was recently injured stacking bundles three high, he was not concerned about Dunn's alleged statements concerning the rule.  (Doc. 16-1 at 13 (44:16-19)).

On or about April 15, 2011, Watkins bid on another job requiring the MCT.  (Doc. 16-5 at 4).  Around this time, he was informed he had to wait six months after failing the MCT before retaking the test.  (Doc. 16-1 at 61-62 (234:9-238:6)).   On or about April 19, 2011, Watkins received another raise.  (Doc. 16-4 at 105).

**Watkins' Work History From April 20, 2011 through June 22, 2011**

Sometime in late April or early May 2011, Watkins spoke with Watts, Thompson, and Wilkerson about the timeframe for retaking the MCT.  (Doc. 16-1 at 61 (234:9-23)).  According

to Watkins, EFP's Handbook reflected, and the "general consensus" of other employees was, the correct amount of time was not six months, but four months between an MCT failure and being eligible to retake the test.  (*Id.* at 61 (236:5-14)).  Neither the handbook nor the CBA contain any express mention of the MCT or the timeframe for retaking it, (doc. 16-4 at 23-65, 66-90); however, the CBA contains express language regarding "Level Test[s]" stating: "TEAM MEMBERS WILL BE ALLOWED TO RETAKE THE LEVEL TEST EACH FOUR (4) MONTHS."  (*Id.* at 69).  Thompson and Watts told Watkins that employees were eligible every six months for the MCT.  (Doc. 16-1 at 61 (235:7-11)).

During May and June 2011, Watkins complained  to Dunn, Cottles, Thompson, Watts, Scalzo (a JBPCO employee), and Yeager about what he felt was race discrimination in workload on second shift among Warehouse B employees because he felt Russell had a lighter workload than he and Mullins.[8]  (Docs. 16-1 at 19 (67:1-18), 45-46 (173:16-174:23) & 16-2 (266:9-13)). Watkins also complained to Dunn, Harvel, Watts, and Yeager about the lack of fans in the workplace because of the hot temperatures in the plant.  (Docs. 16-1 at 16 (55:17-56:3)). Watkins testified he believed his pushing to get fans was part of the reason he was terminated. (*Id.* at 16 (9-13), 23 (84:9-10)).

Watkins claims he was "basically brushed off" by Dunn, Thompson, and Cottles.  (Doc. 16-2 at 9-10 (268:1-270:10).  Watts told Watkins "we'll look into it," (doc. 16-2 at 11-12 277:18-178:7), and, on two occasions, Yeager addressed Watkins' complaints with him, (doc. 16-2 at (268:1-271:15)).  During the first discussion, Yeager told Watkins he agreed with him about the fans and, as to Watkins' concerns about uneven workload, he needed to observe the

---

[8] While Watts and Yeager recall Watkins complaining about uneven or unequal workload, they do not recall allegations of race discrimination.  (Docs. 18-1 at 15 (54:11-56:8) & 16-7 at 6-7 (20:2-21:14)).

Decatur facility operations to determine how to address the complaint.  (Doc. 16-7 at 7 (21:15-22:8)).  Yeager then investigated by observing plant operations and also speaking with Cottles on two occasions about how the workload is scheduled for warehouse employees.  (*Id.* at 7-8 (22:9-28:5)).  Cottles told Yeager about the processes in the plant, including the frequency of mold changes and that he deferred to his supervisors regarding division of workload.  (*Id.*).

About a week later, Watkins and Yeager spoke again, and Watkins asked Yeager what he had found out.  (Doc. 16-7 at 8 (27:23-28:11)).  Yeager informed Watkins he had ordered fans to be installed and it was his understanding from his investigation the workload depended on the output of individual machines.  (*Id.* at 8-9 (28:6-30:15)).  Yeager also told Watkins that, because he was not at the plant the previous week, he would "continue to observe" and verify the accuracy of what Cottles told him.  (*Id.*).  Yeager believed Watkins was very thankful for his investigation.  (*Id.* at 9 (29:19-30:1)).  According to Watkins, on June 21, 2011, Yeager and Scalzo told him they were going to have a meeting the next day to further discuss his complaints about his workload and the fans.  (Doc. 16-1 at 23 (84:6-86:7)).

Also on June 21, 2011, Cottles, while assisting other employees loading trucks on the loading dock, saw Watkins with bundles nearby.  (Docs. 17-1 at 39-40 (148:4-150:16), 42 (158:5-20) & 25-7 at 2).  Although Watkins purports to dispute whether it was possible for Cottles to see him stacking the bundles, (doc. 16-2 at 14-15 (289:22-291:8), he admits that when Cottles confronted him he admitted to stacking bundles three high by hand, (*id.*at 14 (289:17-21), 16 (294:14-296:22), 32 (359:5-14)).  Watkins never told Cottles about Dunn's alleged comments about ignoring the rule, (doc. 16-1 at 15-16 (53:13-55:5)), and did not tell Thompson or Watts about the alleged comments, (docs. 17-4 at 20-21 (75:20-79:4) &18-1 at 23 (88:2-6)).  Cottles wrote down what transpired, put the note in HR's black box without speaking to Thompson

16

about it, and went home.  (Doc. 17-1 at 47 (179:5-23)).  Thompson received the note, and brought it with her to discuss with Watts.  (Doc. 18-1 at 22-23 (83:14-82:2)).  Watts discussed the write-up with Thompson, Cottles, Dunn, and Yeager.  (*Id.* at 18-19 (68:8-69:20), 23 (86:3-14)).  Dunn told Watts his only knowledge of the incident was what Cottles had written on the page, although he may have been working in the warehouse at the time.  (*Id.* at 23 (86:7-88:6)).  Cottles told Watts he witnessed Watkins violate the rule, restating what he had written in the original note.  (*Id.*).  Based on the information he had, Watts decided Watkins' violation was a "gross violation" of Rule 10 and decided to terminate Watkins' employment for the willful violation of the Rule.  (Doc. 18-1 at 22 (81:19-82:17)).  Watts testified Watkins' race had nothing to do with his decision to terminate his employment.  (*Id.* at 34 (129:3-7)).

Had Watkins informed Watts of Dunn's alleged comments about ignoring the rule, Watts would have investigated and the results of the investigation may have affected his decision to terminate Watkins' employment.  (Doc. 18-1 at 24 (89:1-90:1)).  Additionally, Watts would have terminated Dunn's employment if he knew Dunn had told employees to disregard the rule.  (*Id.* at 23 88:7-13)).

Dunn presented Watkins with the termination notice, per standard procedure, along with Vickie Vickery, a Union representative. (Doc. 16-5 at 38-39).  The Union grieved Watkins' termination, as it does all terminations.  (Docs. 18-1 at 14 (52:8-11) & 16-5 at 40-41).   The Union's Executive Board, which included two black members, accepted EFP's decision to terminate Watkins' employment and did not appeal the grievance past the initial stage. (Doc. 17-6 at 8 (26:20-28:19)).

**Various Remarks**

On one occasion, Dunn allegedly told Watkins "we still tar and feather y'all around here

for making a fuss." (Doc. 16-1 at 46 (174:1-3)). Watkins considered this to be racially derogatory and related to his alleged complaint of race discrimination in work assignments and his complaint about lack of fans. (*Id.* at 45 (171:4-20)). Although Cottles heard about a tar and feather comment through the grapevine, he did not know who said it. (Doc. 17-1 at 27 (98:18-100:18)). Thompson also heard about the tar and feather comment but did not know who said it. (Doc. 17-4 at 22-23 (122:19-125:4)). At another point, Dunn allegedly told Watkins something about having plenty of guns in his car "to take you out if you keep raising a fuss" or something like that. (*Id.* at 52 (199:17-200:19)). No one else at EFP, management, Union, or otherwise, said anything to Watkins he considered racially discriminatory or derogatory based on his race. (*Id.* at 52-53 (201:19-202:3); doc. 16-2 at 10 (273:1-16), 13 (283:23-284:6), 29 (347:20-348:4)32 (361:5-8)).

Watkins maintains EFP discriminated against him "based mainly on race and retaliation," (doc. 16-1 at 45 at (171:4-5), but testified "religion maybe had a small percentage of it," (*id.* (171:5-6), and that he "believe[d] [age] maybe had a little to do with it," (*id.* (171:16-20)). However, Watkins explained "it was mainly the race and retaliation, because I wasn't fired until I started bringing up about the discrimination of the workload between the white workers and the – and the black workers." (*Id.* (171:4-173:7)).

### Amberly Franklin's Testimony Concerning Warehouse B Employee Jonathan

Amberly Franklin ("Franklin"), a black female, worked for EFP as a packer from August 25, 2010, through her termination for attendance (nine points) on December 21, 2011. (Doc. 18-6 at 7 (21:13-22:9), 12 (42:23-43:14)). Franklin worked on second shift until May 1, 2011; was transitioned to third shift on May 2, 2011; and back to second shift on June 27, 2011. (*Id.* at 12-13 (44:3-46:23)).

At some point during the Fall of 2011, in connection with fixing a label error on a product referred to as "Suburban," Franklin left her machines and went into the warehouse to address the error and spoke with the Warehouse B employee stacking the mislabeled Suburban product. (Docs. 18-6 at 21-22 (80:15-82:5) & 18-7 at 4).[9] The Warehouse B employee, "Jonathan," was stacking bundles three high by hand. (Doc. 18-6 at 22 (82:6-19)). Franklin noticed Cottles was nearby, less than ten to fifteen feet away, engaged in counting products prior to shipping, but not the Suburban products Jonathan was stacking three high. (*Id.* at 23-24 (88:16-89:20), 24 (90:23-91:16), 25 (93:20-21, 94:1-7), 26 (99:5-11)). Other than this single incident with Jonathan, Franklin witnessed no other employee stacking bundles three high by hand. (*Id.* at 27 (101:19-102:11)). Cottles testified he never told Franklin he saw Jonathan stacking bundles three high. (*Id*. at 25 (96:1-4), 27 (98:17-23)).

**Antonio Lee's Testimony**

Antonio Lee ("Lee"), a black male, worked as a Warehouse B employee from August 20, 2010, through his termination for attendance (9.5 points) on August 29, 2011. (Doc. 18-5 at 46, 75). Lee testified there were occasions, after the April 2011 bundle-stacking rule was implemented, when Cottles was in the warehouse while Russell and Zach Pirtle ("Pirtle"), both white males, were stacking bundles three high. (Doc. 18-4 at 28-29 (105:6-112:16)). Lee speculated that, if Cottles didn't see Russell and Pirtle violating the rule, "it had to be a miracle," (*id.* at 29 (111:19-20)), but later admitted there are bundles throughout the warehouse that would

---

[9] EFP argues the Court should not consider Franklin or Antonio Lee's declarations to the extent they lack basis in personal knowledge, are conclusory, and are contradicted by their later, sworn deposition testimony. (Doc. 26 at 7 n.6) (citing Fed. R. Civ. P. 56(c)(4)). Franklin's testimony from six months after executing her declaration that she did not remember when this incident occurred does not directly contradict her statement that it occurred sometime in the Fall of 2011. *See Lane v. Celotex Corp.*, 782 F.2d 1526, 1432 (11th Cir. 1986) (explaining courts "may only disregard an affidavit that contradicts, without explanation, previously given clear testimony").

be in a person's field of view when walking throughout the warehouse, (*id.* (112:3-16)).  Lee's speculation as to what Cottles saw is not itself evidence.

Concerning the April bundle-stacking rule, Dunn told Lee: "Do what you have to do to get the work done and keep the machines from getting shut off" and that "Ronnie [Cottles] is not going to be here after four [p.m.]."  (Doc. 18-5 at 81)  Lee interpreted these statements to mean Dunn was "basically giving [him] the okay to throw [bundles] three high [by hand]."  (Doc. 18-4 at 24 (92:7-12)).  Dunn never told Lee that Cottles said to ignore the rule.  (*Id.* at 23 (85:15-86:3)).

**Other Alleged Comparators**

The following are Warehouse B employees, in order of seniority, who are pertinent to this case:

| | |
|---|---|
| David Russell | 03/18/2010 |
| Darryl Haggenmaker | 04/21/2010 |
| Josh Proctor | 07/02/2010 |
| Antonio Lee | 08/20/2010 |
| Milton Watkins | 10/19/2010 |
| Jason Mullins | 04/08/2011 |

(Doc. 16-5 at 43).  Seniority could affect work assignments on second shift.  (Doc. 18-6 at 14 (49:20-50:17)).

Watkins contends Russell was treated more favorably with respect to attendance discipline.  (Docs. 1 at ¶15 & 16-2 at 5 (250:8-15)).  When Russell was in jail for a misdemeanor in January 2011, someone called in for him every day during his absence, and when he returned, he had nineteen points under the attendance policy.  (Doc. 17-4 at 31-32 (120:8-121:22)).  Having previously received a verbal warning for two points, Russell was issued a written warning when he returned in accordance with past practice.  (*Id.*).  Russell's next occurrence

resulted in a three-day suspension and the following occurrence resulted in his termination. (Doc. 16-6 at ¶12, 12-13).

On or about July 27, 2010, Darryl Haggenmaker ("Haggenmaker"), a white male warehouse employee on first shift, crawled into a baler, after turning the power off, disregarding a safety placard stating: "Keep Hands And Body Outside Of Baler at All Times" and placing himself at risk of injury.  (Docs. 18-1 at 24-26 (91:20-99:16) & 25-8 at 4-5).  Although Watts considers this a gross safety violation and may have considered terminating Haggenmaker, Watts was out of town when the discipline was issued and could not revisit the discipline due to double jeopardy constraints with the Union.  (*Id.*).  Thompson, considering in part that the power was turned off on the machine, made the decision to suspend Haggenmaker in Watts' absence.  (Doc. 17-4 at 28-29 (107:7-109:4)).  Thompson testified that, when Watts returned, Watts told her she should have fired Haggenmaker.  (*Id.* at 29 (109:5-12)).

Watts testified there was at least one, and were possibly two, other employees who were terminated for safety violations.  (Doc. 18-1 at 13 (47:3-11)).  Watts could not recall any other employee whose discipline jumped straight to discharge without going through any of the lesser steps of progressive discipline for a safety violation.  (*Id.* at (48:10-16)).

### Watkins' Replacement

Chris Long ("Long"), a black male, was the next person hired into the Warehouse B position following Watkins' termination.  (Doc. 16-6 at ¶12).  EFP hired Long on June 27, 2011.  (*Id.*).

### Watkins' Unemployment Compensation Testimony

On July 22, 2011, after conducting a hearing on Watkins' claim, the Alabama Department of Industrial Relations ("ADIR") administrative hearing officer issued a

determination that Watkins was discharged for misconduct committed in connection with his work for violating a safety rule, including noting Watkins admitted violating the rule and he was partially disqualified from receiving unemployment benefits. (Doc. 18-8 at 2-3).

### III. Analysis

Watkins initiated this action asserting claims under Title VII and § 1981[10] for racial discrimination and retaliation. (Doc. 1). Specifically, Watkins alleges discriminatory discipline, denial of a promotion, and termination and retaliatory discharge. (*See id.*). Because both Title VII and § 1981 have the same requirements of proof and use the same analytical framework, *see Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998), the court will expressly address the Title VII claims with the understanding the analysis also applies to the § 1981 claims unless indicated otherwise.

### A. Discrimination Claims (Discipline, Promotion, and Termination)

"A plaintiff may prove a claim of intentional discrimination through direct evidence, circumstantial evidence, or through statistical proof." *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1274 (11th Cir. 2008). Where, as here, a plaintiff offers only circumstantial evidence, the court evaluates the sufficiency of his claims through the burden shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). Under this framework, the

---

[10] Despite EFP's arguments to the contrary, Watkins' § 1981 claims are not barred by collateral estoppel. In this context, collateral estoppel depends on whether the race discrimination and retaliation issues were litigated and decided in the state judicial proceeding. *See Carlisle v. Phenix City Bd. of Educ.*, 849 F.2d 1376, 1379-80 (11th Cir. 1988). If the race claims were not decided in the course of the state action, there can be no collateral estoppel. *Id.* (citations omitted). EFP attempts to assert collateral estoppel on the basis of a twenty minute ADIR telephone hearing where the issue of disparate treatment was irrelevant to the outcome, and the hearing officer prohibited Watkins from discussing the discipline of other employees. (*See* doc. 23). Because this action is dependent upon whether similarly situated employees who violated the same policies as Watkins were treated more favorably, the ADIR decision does not work to preclude Watkins' claims in this action. *See e.g., Rawlinson v. Whitney Nat'l Bank*, 416 F. Supp. 2d 1263, 1273-74 (M.D. Ala. 2005).

plaintiff bears the initial burden of establishing a *prima facie* case.  *Id.* at 802.  To do so, he must show: (1) he was a member of a protected class, (2) who was qualified for his position, but (3) was subject to an adverse employment action and (4) treated less favorably than a similarly situated employee outside of his protected class.  *Burke-Fowler v. Orange Cnty., Fla*, 447 F.3d 1319, 1323 (11th Cir. 2006).  "The successful assertion of a *prima facie* case then creates a rebuttable presumption that the employer unlawfully discriminated against the plaintiff."  *Rioux*, 520 F.3d at 1275.  (internal quotation marks and citations omitted).

Once the plaintiff establishes a *prima facie* case, the burden then shifts to the employer to produce evidence that it had a legitimate, non-discriminatory reason for the challenged action. *Rioux*, 520 F.3d at 1275.  If the employer satisfies its burden, the burden shifts back to the plaintiff to "show that the proffered reason really is a pretext for unlawful discrimination."  *Id.* (internal quotation marks and citations omitted).

### 1.  Disparate Treatment: Suspension for Attendance

Watkins argues EFP treated him differently than a similarly situated white employee when he was suspended for attendance.[11]  (Doc. 1 at ¶¶ 14-15).  Specifically, Watkins argues he was suspended for absences, whereas Russell, a white employee, violated the attendance policy in a more egregious manner, but was not suspended.  (Doc. 22 at 60).  Watkins' argument, however, omits many of the relevant facts.

The CBA contains EFP's attendance policy and provides for progressive discipline for employee "occurrences" or points under the system.  (Doc. 16-4 at 84-85).  Subject to past practice recognized under the CBA, the CBA prescribes attendance discipline for occurrences within a twelve month period as follows: Two points, oral or "verbal" warning; four points,

---

[11] EFP does not dispute the first three elements of the *prima facie* case as to this claim. (*See* doc. 15 at 34-36).

written warning; six points, three day suspension; eight points, "automatic discharge." (Doc. 17-5 at 41). Points are removed from the employee's record after one year. (*Id.*). Employees can also earn back half a point for every thirty calendar days of perfect attendance. (*Id.*).

Employees must be present at work to receive discipline. (Doc. 16-6 at ¶10). Under the CBA, past practice dictates employees must receive the next step of attendance discipline upon returning to work, even if having accrued sufficient points to receive a higher level of discipline. (Doc. 17-4 at 30 (115:23-117:20)). For example, if an employee previously received a verbal warning, had accrued three points, then was absent for three days, but called in every day while absent prior to the start of his shift, upon his return he would have six points; however, he would only receive a written warning, the next level of discipline, and not a suspension. (*Id.*; *see* doc. 16-6 at ¶12).

On January 28, 2011, Watkins incurred 2.5 points under EFP's attendance policy and received a verbal warning. (Doc. 16-5 at 7). On March 4, 2011, Watkins incurred 5.5 points under the policy and received a written warning. (*Id.* at 8). On March 22, 2011, Watkins incurred 6.0 points under the policy and was suspended. (*Id.*). Watkins was present at work each time he was disciplined. (Doc. 16-1 at 54 (208:2-11), 55 (212:4-7)). There is no evidence EFP did not follow its attendance policy, progressive discipline, or established past practice when suspending Watkins after his third attendance "occurrence."

Watkins contends Russell was treated more favorably with respect to attendance discipline. (Docs. 1 at ¶15 & 16-2 at 5 (250:8-15)). When Russell was in jail for a misdemeanor in January 2011, someone called in for him every day during his absence, and when he returned, he had nineteen points under the attendance policy. (Doc. 17-4 at 31-32 (120:8-121:22)). Having previously received a verbal warning for two points, Russell was issued a written

warning, the next step under the progressive discipline policy, when he returned in accordance with past practice.  (*Id.*).  Russell's next occurrence resulted in a three-day suspension and the following occurrence resulted in his termination.  (Doc. 16-6 at ¶12, 12-13).  EFP followed the same attendance policy, progressive discipline and established past practice as it applied to Watkins' occurrences when only issuing Russell a written warning, the next step under the progressive discipline regime, when he returned to work.

Despite EFP applying the same policy and practices to Watkins and Russell, Watkins points to a supplemental agreement to the CBA stating "eight (8) occurrences within a consecutive twelve month period – automatic discharge."  (Doc. 16-4 at 85) (emphasis omitted).  Watkins does not address the established past practice of only issuing discipline once the employee is present at work or that employees must receive the next step of attendance discipline upon returning to work, even if having accrued sufficient points to receive a higher level of discipline.  (*See* doc. 22 at 60-61).  Additionally, although it is apparent EFP did not discharge Russell for accruing more than eight points within a consecutive twelve month period, Watkins does not contends he, nor any other African-American employee, was discharged for accruing eight points in a twelve month period.  Simply put, Watkins fails to show how the attendance rules were applied differently to anyone outside of his protected class or how EFP's reliance on established past practice[12] is a pretext for discrimination.  Accordingly, EFP's motion for summary judgment is due to be granted on this claim.

### 2.  Disparate Treatment: Promotion/Administration of the MCT

---

[12] The Tardiness and Attendance policy states that past practices are to be "null and void."  (*See* doc. 17-5 at 40).  Watkins fails to make any arguments based on this provision.  It is not the court's burden to distill every potential argument that could be made on summary judgment, rather the onus is on the parties to formulate arguments.  *Resolution Trust v. Dunmar Corp.*, 43 F.3d 587, 589 (11th Cir. 1995).

Next, Watkins contends he was subjected to disparate treatment based on EFP's discriminatory administration of the MCT, denying him the opportunity to apply for the Set-Up job because of his race.  (Doc. 1 at ¶¶7-12).  Specifically, Watkins argues he was denied an opportunity to retake the MCT after four months, being required to wait six months, whereas Josh Proctor, a white employee, was permitted to take the MCT within four months of failing and was not required to wait six months.  (Doc. 22 at 58-60).  Watkins further contends, if he would have passed the test, he would have been entitled to the Set-Up position instead of Anthony Parker, who was awarded the position, because Watkins had seniority.  (*Id.* at 59).

Based on past practice with the Union, EFP contends it was standard practice to require an employee to wait <u>six months</u> between failing the MCT and retaking it.  (Doc. 17-4 at 6 (18:22-19:2)).  While the CBA contemplates the MCT, this practice was not reduced to writing in the 2009 CBA.  (*Id.* at 7 (22:13-23:7)).  An employee promoted into a position requiring the MCT, including Set-Up, was then eligible to advance further in the position depending on their score on a Level Test related to the position.  (Doc. 17-4 at 7 (23:14-19)).  Under the CBA, an employee who failed the Level Test had to wait <u>four months</u> before being eligible to retake it.  (Doc. 17-4 at 7 (23:14-19)).  Watkins does not understand how the Level Tests are administered or the associated timeframe between failing a Level Test and being eligible to retake it.  (Doc. 16-1 at 58 (222:22-223:5) & 59 (227:18-23)).   Watkins' testified that, at one point, Thompson told him he could retake the MCT four months after he failed it, not six.  (Doc. 16-1 at 59 (226:21-227:17)).  Watkins contends another employee, Josh Proctor ("Proctor"), a white male, was permitted to take the MCT in October 2010 and again in February 2011, only being required to wait four months.  (Doc. 16-1 at 60 (230:6-17)).  Because EFP required Watkins to wait at least six months to retake the MCT, Watkins was not permitted to retake the test prior to

Anthony Parker ("Parker"), a white male with less seniority, being awarded the Set-Up position. (Docs. 25-15 at 15 & 16-5 at 43).

There is no evidence other than Watkins' inadmissible testimony regarding what Proctor told him that Proctor took the MCT in October 2010.  (*See supra* n.3).  The cover sheets from Proctor's August 2010 and February 2011 MCTs are in the record.  (Doc. 17-5 at 5-6).  No cover sheet for the alleged October 2010 MCT has been provided.  Although it is conceivable that Proctor could have taken the test in October 2010 and a cover sheet was not produced, a jury would also have to believe either (1) that the August 2010 cover sheet is not legitimate or (2) that EFP permitted Proctor to take the test in August 2010, October 2010, and February 2011. Neither of these inferences is reasonable.

Watkins has not submitted any admissible evidence to dispute the otherwise uncontested evidence demonstrating EFP followed a standard practice requiring an employee to wait six months between failing the MCT and retaking it.  Accordingly, EFP's motion for summary judgment is due to be granted on this claim.

### 3.  Disparate Treatment: Termination

#### a.  *Prima Facie* Case

As to Watkins' discriminatory discharge claim, EFP does not dispute Watkins can establish the first three elements of a *prima facie* case.  Instead, EFP contends Watkins cannot point to a similarly situated comparator.  (Doc. 15 at 36-37).  An appropriate comparator would be a similarly situated, non-minority employee who his employer treated more favorably than he was treated.  *Johnson v. Gestamp Alabama, LLC*, 946 F. Supp. 2d 1180, 1195 (N.D. Ala. 2013). "To make a comparison of the plaintiff's treatment to that of non-minority employees, the plaintiff must show that he and the employees are similarly situated in all relevant respects."  *Id.*

(quoting *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997)).  To be considered "similarly situated," the compared employees must have been "involved in or accused of the same or similar conduct, yet "disciplined in different ways" for that conduct.  *Id.* (quoting *Holifield*, 115 F.3d at 1562).

First, Watkins argues Davis Russell, Jonathan Ray, and Zach Pirtle are proper comparators.  (Doc. 22 at 38-39).  Russell, Ray, and Pirtle all had the same work duties as Watkins and were subject to the same policies.  Therefore, the court must examine whether their conduct and respective punishment was similar.  *Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1311 (11th Cir. 1998).  Watkins offers testimony from two other employees, Franklin and Lee, explaining they witnessed Russell, Ray, and/or Pirtle violate the April 2011 bundle-stacking rule while Cottles was in the warehouse.[13]  It is undisputed neither Russell, Ray, nor Pirtle were terminated or disciplined in any way for this violation.  The question remains whether Cottles witnessed these employees' violations.

This is simply a question of fact.  Franklin and Lee's speculation regarding whether Cottles saw these employees violate the rule is not evidence.  However, Franklin did testify Cottles was less than ten to fifteen feet away from Ray when he was violating the April 2011 bundle-stacking rule.  (Doc. 18-6 at 23-24 (88:16-89:20), 24 (90:23-91:16), 25 (93:20-21, 94:1-7) 26 (99:5-11)).  A reasonable juror could conclude that Cottles saw white employees violating the April 2011 bundle-stacking rule but did not report them.  However, there is also evidence the warehouse storage area is approximately the size of a football field, (doc. 16-6 at ¶5, 8), and

---

[13] EFP challenges Franklin and Lee's statements as "conclusory, vague, and otherwise inadmissible." (*See e.g.*, doc. 26 at 26).  To the extent the declarations contain speculation, such statements are not evidence and have not been considered.  To the extent EFP contends the statements should not be considered because they contradict later deposition testimony, such argument is not supported by the record.

there are bundles throughout the warehouse that could be in a person's field of view when walking through the warehouse, (doc. 18-4 at 29 (112:3-16)).   Whether Cottles saw the other employees violate the rule is a question of fact for the fact-finder, not the court on a motion for summary judgment.   For purposes of summary judgment only, Russell, Ray, and Pirtle are appropriate comparators to shift the burden to EFP to state a legitimate, non-discriminatory reason for Cottles' action.

Next, Watkins argues Haggenmaker is an appropriate comparator.  (Doc. 22 at 38-39). Although Haggenmaker worked a different shift, he was subject to the same policies as Watkins. In July 2010, Haggenmaker, a white male, crawled into a baler, after turning the power off, disregarding a safety placard stating: "Keep Hands And Body Outside Of Baler at All Times." (Docs. 18-1 at 24-26 (91:20-99:16) & 25-8 at 4-5).  Like Watkins' violation of the April 2011 bundle-stacking rule, Haggenmaker's offense constituted a gross safety violation that *may* have resulted in termination.   Because Watts was out of town, Thompson made the disciplinary decision and decided to suspend Haggenmaker.  (Doc. 17-4 at 28-29 (107:7-109:4)).   Thomas explained she considered the fact that Haggenmaker had turned off the power to the baler before entering the machine in her decision to suspend him instead of terminating his employment.  (*Id.* at 29 (109:10-16)).

The fact different decisionmakers were involved in administering Watkins and Haggenmaker's discipline is relevant, but not dispositive.  *Horn v. United Parcel Service, Inc.*, 433 Fed. Appx. 788, 793 (11th Cir. 2011) (citing *Anderson v. WBMG-42*, 253 F.3d 561, 656-66 (11th Cir. 2001)).   Different managers could have different management styles that *could possibly* account for the disparate treatment.  Here, it appears Thompson could have imposed a less severe punishment because she was the HR Manager, not the plant manager, and didn't want

to go out on a limb and terminate his employment.  She could have also, as she testified, imposed a less severe punishment because she considered other mitigating factors, such as the fact Haggenmaker turned off the baler.  Neither of these inferences, in favor of defendant, is appropriate at summary judgment.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor).  For purposes of summary judgment only, Haggenmaker is an appropriate comparator to shift the burden to EFP to state a legitimate, non-discriminatory reason for its action.

### b.  Legitimate, Non-Discriminatory Reason

EFP's stated reason for writing-up and later terminating Watkins' employment is violation of a work rule.  This is a legitimate, non-discriminatory reason sufficient to shift the burden to Watkins to demonstrate it is a pretext for unlawful discrimination.  *See Bush v. Houston Cnty. Comm'n*, 414 Fed. Appx. 264, 267 (11th Cir. 2011) (citations omitted).  The burden now shifts back to Watkins to present evidence demonstrating EFP's legitimate, non-discriminatory reason for terminating his employment was a pretext for unlawful discrimination.

### c.  Pretext for Discrimination and Cat's Paw Theory of Liability

To establish pretext, Watkins "must cast sufficient doubt on [EFP's] proffered nondiscriminatory reason[] to permit a reasonable factfinder to conclude that [EFP's] proffered legitimate reason[] w[as] not what actually motivated its conduct."  *Brown v. Chertoff*, 563 F. Supp. 2d 1372, 1378 (S.D. Ga. 2008) (quoting *Combs v. Plantation Patters*, 106 F.3d 1519, 1538 (11th Cir. 1997)).  Here, there is no evidence Watts, the decision-maker, treated anyone differently than he treated Watkins or that Watts harbored any racial animus.  Therefore, Watkins must rely on another theory of liability.

Watkins relies on the "cat's paw" theory of liability,[14] also known as "subordinate bias theory." (Doc. 22 at 42-48). Under this theory, a plaintiff seeks to hold his employer liable for the animus of a supervisor who is not charged with making the ultimate employment decision. *Sims v. MVM, Inc.*, 704 F.3d 1327, 1334-35 n.6 (11th Cir. 2013) (citing *Staub v. Proctor Hosp.*, -- U.S. --, 131 S. Ct. 1186, 1190 (2011)). "[I]f a supervisor performs an act motivated by [discriminatory] animus that is *intended* by the supervisor to cause an adverse employment action, and that act is the proximate cause of the ultimate employment action, then the employer is liable . . . ." *Staub*, 131 S. Ct. at 1194; *see King v. Volunteers of Am., N. Ala., Inc.*, 502 Fed. Appx. 823, 828 (11th Cir. 2012) (applying the cat's paw principles of *Staub* to Title VII). Under this theory, Watkins' termination is discriminatory only if someone's racial animus can be imputed to the final decisionmaker, Watts.

Watkins contends Watts was Dunn and/or Cottles' "cat's paw." (Doc. 22 at 43-48). Specifically, he argues both Dunn and Cottles exhibited discriminatory animus intended to cause his termination and that Dunn and Cottles' actions were the proximate cause of his termination. (Doc. 22 at 43-48). Watkins points to Cottles reporting he violated the April bundle-stacking rule, but not reporting numerous white employees for violating the same rule. (*Id.* at 43-44). Watkins also points to Dunn not telling Watts during the investigation he had instructed Watkins and others to continue stacking bundles as they had prior to the April 2011 rule as well as to Dunn's racially-charged comments, specifically "we still tar and feather y'all around here for making a fuss." (doc. 16-1 at 46 (174:1-3), and telling Watkins about the guns in his care and how he'd "take you out if you keep raising a fuss, (doc. 17-4 at 52 (199:17-200:19)). (*Id.* at 44-

---

[14] The "cat's paw" theory gets its name from the fable of a 17th Century French poet, about a monkey who persuaded a cat to pull chestnuts out of the fire, so the cat gets burned and the monkey makes off with the chestnuts.

48).  From this evidence a reasonable jury could infer a racial animus on behalf of Dunn and Cottles and that each intended to cause Watkins' termination.  Proximate cause is also present.  In this context, "proximate cause" is defined as "some direct relation between the injury asserted and the injurious conduct alleged, and excludes only those link[s] that are too remote, purely contingent, or indirect."  *Staub*, 131 S. Ct. at 1192.  Cottles reporting Watkins' violation and Dunn not telling Watts he had instructed Watkins (and others) to disregard the April 2011 bundle-stacking rule are certainly proximate causes of Watkins' termination.  (*See* doc. 18-1 at 24 (89:1-90:2) (Watts' testimony stating if he would have known about Dunn's alleged comments, there would have been further investigation that may have resulted in a different result)).

Cat's paw liability generally is not appropriate where the decisionmaker is not a mere "rubber stamp" for the offending supervisor, but conducts an independent investigation of the events.  *See Sirpal v. Univ. of Miami*, 509 Fed. Appx. 924 (11th Cir. 2013) (stating that cat's paw situation was inapplicable because the independent investigation determined dismissal was, apart from the recommendation, entirely justified); *but see King*, 502 Fed. Appx. at 828 (holding the plaintiff demonstrated potential liability under a "cat's paw" theory when the offending supervisor made statements that she would engineer the plaintiff's termination and that the decision maker rubber-stamps her recommendations).  At first blush, this principle seems to apply because Watts was more than a "rubber stamp."  After receiving the report from Thompson, Watts conducted an investigation, discussing Cottles' note with Thompson, Dunn, Cottles and Yeager.  (Doc. 18-1 at 22-23 (68:8-69:20)).  Based on the information he had, Watts determined Watkins' had committed a "gross violation" of safety Rule 10 and decided to termination his employment.  (*Id.* at 22 (81:19-82:17)).  However, this is not the end of the

inquiry.   A supervisor's bias can be imputed to the decisionmaker, even if there is an independent investigation, if the decisionmaker "relies on facts provided by the biased supervisor," by "effectively delegat[ing] the factfinding portion of the investigation to the biased supervisor."  *Staub*, 131 S. Ct. at 1193.  Watts relied entirely on Dunn and Cottles for the "fact-finding portion" of the investigation.   (Doc. 18-1 at 22-23 (68:8-69:20)).   Although he also discussed the matter with Thompson and Yeager, (*see id*.), neither were present at the time of the alleged violation.  Watkins has presented sufficient evidence of Dunn and Cottles' racial animus, their intention, and proximate cause to survive EFP's motion for summary judgment on this claim.

## B.  Retaliation Claim

To establish a *prima facie* case of retaliation, a plaintiff "must present evidence that: (1) he engaged in statutorily protected conduct; (2) he was adversely affected by an employment decision, and (3) there was a causal connection between (1) and (2).  *Doxie v. Volunteers of Am., Se., Inc.*, -- F. Supp. 2d --, 2014 WL 3894062 (N.D. Ala. 2014) (citing *Drago v. Jenne*, 453 F.3d 1301, 1307 (11th Cir. 2006)).  Once established, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for the challenged employment decision.  *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001).  If the employer successfully articulates a legitimate, non-retaliatory reason, the plaintiff must show that each reason is a pretext for unlawful retaliation and that the plaintiff's protected activity as the "but-for" cause of the adverse action.  *Id.*; *Mealing v. Ga. Dept. of Juvenile Justice*, 564 Fed. Appx. 421, 427 (11th Cir. 2014) (citing *University of Texas Southwestern Medical Center v. Nassar*, -- U.S. --, 133 S. Ct. 2517 (2013)).

### 1.  *Prima Facie* Case and *Nassar*

33

EFP does not directly challenge Watkins' ability to establish a *prima facie* case.[15] Instead, EFP argues Watkins' complaints regarding racial discrimination in workload allocation were not the "but-for" cause of his termination, and, therefore, his retaliation claim is due to be dismissed under *Nassar*.  (*See* doc. 15 at 39-40).  In *Nassar*, the Supreme Court held a plaintiff making a Title VII retaliation claim "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer.  133 S. Ct. at 2534.  This requires proof the adverse employment action would not have occurred in the absence of the alleged unlawful discrimination.  *Id.* at 2533.

EFP points to Watkins' testimony in which Watkins states he believes his complaint about fans, (doc. 16-1 at 16 (56:9-13), and his religion and age were part of the reason he was terminated, (*id.* at 46 (170:19-171:5, 172:16-173:5).  Simply put, EFP asks *Nassar* to do too much.  "But-for" causation does not require unlawful retaliation to be the only factor.  Instead, the plaintiff must prove the wrongful act would not have occurred in the absence of unlawful retaliation.  *See Nassar*, 133 S. Ct. at 2533.  In other words, a sole-causation standard is *not* the same as a but-for, or necessary, causation standard.  *See Freeman v. Koch Foods of Ala.*, No. 2:09-cv-270-MEF, 2010 WL 9461668, at *2 (M.D. Ala. June 15, 2010) (discussing the "but-for" causation standard as applied in ADEA cases after *Gross v. FBL Financial Services, Inc.*, 557

---

[15] It appears Watkins has presented evidence sufficient to establish a *prima facie* case. During May and June 2011, Watkins complained to several managers, including Dunn, Cottles, Thompson, and Watts, about alleged race discrimination in workload on second shift among Warehouse B employees.  (Docs. 16-1 at 19 (67:1-18), 45-46 (173:16-174:23) & 16-2 (266:9-13)); *see* 42 U.S.C. § 2000e-3(a); *Butler v. Ala. Dept. of Transp.*, 536 F.3d 1209, 1213 (11th Cir. 2008).  On June 21, 2011, Cottles observed Watkins violating the April 2011 bundle-stacking rule.  (Docs. 17 at 39-40 (148:4-150:16), 42 (158:5-20), & 25-7 at 2).  Cottles reported the violation to HR, (doc. 17-1 at 47 (179:5-23), and Watts terminated Watkins' employment for a "gross violation" of safety Rule 10, (doc. 18-1 at 22 (81:19-82:17)).  Causation can be inferred from the close temporal proximity of these events.  *See Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007).

U.S. 167 (2009)).  EFP's *Nassar*-based arguments are without merit.

### 2.  Legitimate, Non-retaliatory Reason

Alternatively, EFP offers a legitimate, non-retaliatory reason for Watkins' discharge, explaining it terminated Watkins' employment because he committed a "gross violation" of safety Rule 10.  (Doc. 15 at 40); *see e.g., Ferguson v. Ga. Dept. of Corr.*, 428 F. Supp. 2d 1339, 1336 (M.D. Ga. 2006) (violation of a work rule is a legitimate, non-retaliatory reason).  The burden now shifts back to Watkins to present evidence demonstrating this reason is a pretext for unlawful retaliation.

### 3.  Pretext for Retaliation

To advance this claim, Watkins must create a genuine issue of material fact whether EFP's reason for his termination is pretextual.  Specifically, Watkins must provide evidence to allow a reasonable fact finder to conclude the proffered reason (i.e., willful violation of safety rule) was not actually the motivation for Watkins' discharge.  *Standard*, 161 F.3d 1332.  Watkins has presented sufficient evidence Watts (and other senior managers) was aware of his complaints. Watkins testified he complained to Watts about alleged racial discrimination approximately three weeks before he was terminated.  (Doc. 16-2 at 11-12 (227:18-279:12)).  He further testified he spoke with Yeager approximately one week before his termination, again raising the issue of racial discrimination in work assignments.  (*Id.* at 12 (280:18-281:5)).  On the day of Watkins' termination, Yeager and Scalzo told Watkins there would be a meeting the next day regarding his race discrimination and other complaints.  (Doc. 16-1 at 23 (84:6-86:7)). There is also evidence another employee who did not engage in protected activity, Haggenmaker, committed a willful safety violation and was not terminated.  Although Thompson chose not to terminate Haggenmaker for the violation, the inconsistent application of

the policy could raise an inference of impropriety.   The evidence also indicates Watkins complained to Cottles regarding unequal workload, and Cottles subsequently reported Watkins' violation of the April 2011 bundle-stacking rule.   There is also evidence Cottles was in the warehouse at the same time other employees who did not engage in protected activity violated this rule, but did not report them.   All of this evidence taken together, and the reasonable inferences therefrom, create a genuine issue of material fact whether EFP's stated reason for terminating Watkins, violation of a work rule, was a pretext for unlawful retaliation. Accordingly, EFP's motion for summary judgment is due to be denied as to this claim.

## IV. Conclusion

EFP's motion for summary judgment, (doc. 14), is **GRANTED IN PART AND DENIED IN PART**.   The motion is **GRANTED** as to Watkins' Title VII and § 1981 claims for disparate treatment based on discipline for absences and the administration of the MCT.   The motion is **DENIED** as to Watkins' Title VII and § 1981 disparate treatment and retaliation claims related to his termination.   A separate order will be entered.

DONE this 22nd day of December 2014.

_____
**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE

36